496 So.2d 611 (1986)
CHEVRON U.S.A., INC.
v.
Lorraine LORIO, et al.
No. CA 85 1388.
Court of Appeal of Louisiana, First Circuit.
October 15, 1986.
Writ Denied December 19, 1986.
*612 W. Richard House, Jr., Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, for plaintiff-appellee.
David C. Kimmel, Asst. Atty. Gen., Dept. of Justice, Lands and Natural Resources Div., Baton Rouge, for defendant-appellant.
Thomas H. Benton, Benton, Benton & Benton, Baton Rouge, for defendant-appellee Lorio Group.
Before SAVOIE, CRAIN and JOHN S. COVINGTON, JJ.
JOHN S. COVINGTON, Judge.
This concursus proceeding was invoked by Chevron U.S.A., Inc. (Chevron) because of claims made on royalties flowing from mineral production on a certain tract of *613 land by both the State of Louisiana (the State) and Lorraine Lorio and other members of her family (the Lorios). After trial on the merits, judgment was rendered in favor of the Lorios and the State brought this suspensive appeal.

FACTS
On August 1, 1972 the Lorios leased the oil, gas and mineral rights on their property along False River, an ox-bow lake[1] in Pointe Coupee Parish, to Chevron. The lease granted a 1/8 royalty to the Lorios, as lessor, to be paid by Chevron, as lessee, on mineral production on the leased property. On August 13, 1973 Chevron leased the mineral rights on State-owned land in the False River area, including water bottoms. The State, as lessor, was entitled to a 1/6 royalty. Both the State and the Lorios claim the ownership of a portion of the former bed of False River, and this disputed area is covered by both the Lorios' lease and the State's lease.
After mineral production began on the property in question, Chevron invoked concursus proceedings because of the conflicting claims of ownership of this land being asserted by the Lorios and the State. In accordance with LSA-C.C.P. art. 4651 et seq., Chevron deposited the royalty accruing from the affected area into the registry of the court. In light of the possibility that the State could be held to own all of the disputed property, Chevron deposited funds equalling the amount of the 1/6 royalty due under the State's lease. Chevron expressly reserved the right to a refund of the difference between the amount of the 1/6 royalty deposited in the registry of the court and the 1/8 royalty that would be due in the event that the Lorios were found to own all or part of the disputed tract.
While the concursus proceeding was pending, the State and the Lorios entered into a compromise agreement dividing the full amount of the funds deposited by Chevron between themselves. The Lorios and the State then moved for a summary judgment, alleging that the compromise disposed of all material issues of fact and law. Chevron opposed the motion on the grounds that the deposit of the funds with the court did not constitute an admission that the full amount was due. The trial court granted the motion for summary judgment. On appeal to this court, the judgment was reversed on the grounds that the compromise agreement did not address the question of ownership, an issue vital to the outcome of the case. The Supreme Court of Louisiana declined to disturb this court's decision. Chevron U.S.A., Inc. v. Lorio, 442 So.2d 1157 (La.App. 1st Cir.1983), writs denied, 444 So.2d 1244 (La. 1984). After the decision by the court of appeal, but before the time period for applying for a rehearing had elapsed, the Lorios and the State entered into a second compromise agreement (compromise II). Compromise II was attached to and incorporated in a request for a rehearing and timely filed with this court. The motion for a rehearing was denied. Compromise II differs from the original compromise in that it declares that the State's lease is the governing lease, yet it did not purport to declare ownership for the State.
Upon remand to the trial court, the parties stipulated that the case would be "trifurcated", i.e. heard in three stages. The first part of the trial would address the question of the validity and effect of both compromise agreements, and, in the event that neither agreement be enforced the second stage of the trial would begin. The second issue to be addressed would be the constitutionality of LSA-R.S. 9:1110. The last stage would be entered into only if the statute was declared unconstitutional, and the issue would be that of historical questions such as ownership of the land and the navigability of False River in 1812.
The trial court held that neither compromise agreement was binding and that LSA-R.S. 9:1110 was constitutional so the third *614 part of the trial was not necessary. In its judgment, the trial court found the Lorios to be the owners of the disputed property and gave Chevron a refund of the difference between the 1/8 royalty found to be due and the 1/6 royalty deposited.

ASSIGNMENTS OF ERROR
The State appealed, contending that the trial court erred in:
1. holding that the compromise agreements were of no legal effect; and
2. upholding the constitutionality of LSA-R.S. 9:1110.

EFFECT OF THE COMPROMISE AGREEMENTS (ASSIGNMENT OF ERROR NO. 1)
The State contends that the trial court erred in finding neither of the compromise agreements to be legally binding on Chevron.
With respect to the original compromise agreement this court stated in the first Chevron U.S.A., Inc. v. Lorio:
Clearly, under LSA-C.C.P. art. 4652, Chevron was entitled to invoke a concursus and to deny liability to one of the claimants.
We find it unnecessary to consider the enforceability of the compromise because the compromise does not resolve all issues of fact and law that exist. Although the compromise partially resolves the conflicting claims between the State and the Lorios, the issue of Chevron's denial of liability to one or the other of the parties impleaded remains unresolved. The determination or resolution of the issue of liability is critical to Chevron in view of the difference in its royalty obligations. (Footnote omitted.)
The court added, by footnote, that the compromise did not settle the ownership questionthe very issue which prompted Chevron to invoke a concursus in the first place. Neither the original compromise nor compromise II determined the ownership of the disputed tract, nor were they based on any proof or recognition of ownership of either party. We agree that the question of ownership must be settled in order to determine Chevron's liability. Because neither compromise determined ownership there is no way to determine liability, thus these compromises cannot be binding on Chevron.
A transaction or compromise has, between the interested parties, a force equal to that of a thing adjudged. A compromise is considered a contract and only those who give their consent can be parties to a contract. Thus a compromise made by some of the interested parties is not binding on the party or parties who did not consent to the compromise. LSA-C.C. arts. 1780, 3071, 3077, and 3078. Because Chevron was not a party to either compromise agreement, nor did Chevron give its consent with respect to either compromise, the compromise agreements cannot be binding on Chevron.
The State contends that Chevron should be bound by the compromises because Chevron only holds those rights by reason of the contract (the lease) between the parties and that matters pertaining to the basic title are free of lessee's rights. This argument fails because neither the State's lease nor the Lorios' lease provided for a waiver by Chevron of the Lessor's warranty in title. The Lorios' lease contains an express warranty of title clause and the State's lease does not expressly exclude a warranty of title, hence it is considered to be implied. LSA-R.S. 31:120. Chevron has a cause of action in warranty under either lease if the lessor does not own the property that he has let out. The obligation to pay the royalty is contractual and as such can only exist under a valid lease contract. With regards to the property in question, only the lease given by the actual owner of the disputed tract would be valid and binding on Chevron. The determination of ownership is essential to the outcome of this concursus proceeding.
The compromise agreements cannot have any legal effect whatsoever on Chevron who was not a party consenting to such agreements. As the parties who entered *615 into these compromises, the State and the Lorios could be bound by the agreements, but only to the extent that they do not conflict with Chevron's rights and obligations under the leases. In compromise II, which basically supersedes the original compromise, the State claims an overriding 1/24 royalty interest and the division of the royalty funds deposited by Chevron is computed on the basis of the 1/6 royalty. There is no provision for a division of funds between the State and the Lorios based on the 1/8 royalty. The Lorios and the State cannot create, by the compromises, rights in addition to those in their respective leases, thus the State cannot claim an overriding 1/24 interest. Because the agreements failed to provide for the division of the 1/8 royalty between themselves, the compromise agreements have no effect and are not binding since the Lorios were held to be the owners of the land in question and there is only the 1/8 royalty, which is not subject to the agreements. Basically the compromise agreements are an attempt to impose more onerous conditions to a contract without the consent of one of the parties to the original contract. The terms of the original lease contracts could not be altered without the consent of all of the parties, and Chevron did not give such consent, therefore the terms of the original leases are binding on Chevron and the compromise agreements are not binding.
Absent a valid compromise by all of the parties involved, only a determination of the ownership of the land in question can govern which lease, and accordingly which percentage royalty payment, is to be honored by Chevron. Neither compromise is dispositive of the ownership of the disputed tract, nor is Chevron a party to either compromise agreement; and, further, both agreements are in conflict with the terms of the original leases, therefore the compromise agreements are of no legal effect.
This assignment of error has no merit.

CONSTITUTIONALITY OF LSA-R.S. 9:1110 (ASSIGNMENT OF ERROR # 2)
The State contends that Act 285 of 1975 (i.e. R.S. 9:1110) violates the Louisiana constitution because it is a legislative attempt to fix the boundary of the bottom of False River which is an unconstitutional alienation of water bottoms; also in that it is in essence a local law which was not introduced as a Local Special Act in accordance with La. Const. of 1974 art. 3 §§ 12, 13 and thus is not constitutionally valid.
Act 285 of 1975, which became LSA-R.S. 9:1110, provides as follows:
The title of the owners of land adjacent to that body of water in Pointe Coupee Parish known as False River shall extend to fifteen feet above mean sea level. The boundary line formed at fifteen feet above mean sea level marks the division between land owned by the State and land owned by private persons along the banks of False River.
By adoption of Article 455, now at 456, of the Civil Code of 1870, the legislature granted the banks of navigable streams to adjacent owners, defining State ownership of the bottoms of navigable streams and the land that is covered by the water in its ordinary low stage. False River was once a navigable waterway and has been declared so by the Louisiana Supreme Court in Sicard v. Chitz, et al, 13 La. 111 (New Orleans, March 1839); thus the State, under LSA-C.C. art. 456, only owns the bed of False River to the ordinary low water mark. Because the record clearly supports a finding that the low stage of False River is considerably below fifteen feet above mean sea level as fixed by LSA-R.S. 9:1110, the State actually has acquired property under this statute. Act 285 of 1975 (LSA-R.S. 9:1110) does not alienate any mineral or property rights of the State, hence it is not violative of Article 9 § 4(A) of the Louisiana Constitution of 1974.
The State also claims that Act 285 of 1975 was a local or special law needing the publication of notice of intention to introduce a bill for passage of such a local law as required by La. Const. of 1974 art. 3 § 13 which states:

*616 No local or special law shall be enacted unless notice of the intent to introduce a bill to enact such a law has been published on two separate days, without costs to the State, in the Official Journal in the locality where the matter to be affected is situated. The last day of publication shall be at least thirty (30) days prior to the introduction of the bill. The notice shall state the substance of the contemplated law, and every such bill shall recite that notice has been given.
The terms "special" and "local" law are not defined by the constitution. La. Const. of 1974 art. 6 § 44(5) does, however, define the term "general" law:
"General law" means a law of statewide concern enacted by the legislature which is uniformly applicable to all persons or to all political subdivisions in the state or which is uniformly applicable to all persons or to all political subdivisions within the same class.
By contrast the definition of "local" or "special" law has been left for judicial determination. A local law has been defined as one that operates only in a particular location without possibility of extending its coverage to other areas even if the requisite criteria of its statutory classification exists there. A statute is a special statute if it affects only a certain number of persons within a class and not all persons possessing the characteristics of the class and, in essence, is one directed to secure some private advantage or advancement for benefit of private persons. Davenport v. Hardy, 349 So.2d 858 (La.1977); Teachers' Retirement System of Louisiana v. Vial, 317 So.2d 179 (La.1975). It is well established that a law is not local or special, even though its enforcement may be restricted to a particular locality, simply because the conditions under which it operated do not prevail in every locality.
LSA-R.S. 9:1110 is not a local or special law for several reasons. This law affects the State and the ownership of the State property, which is a vital concern of every citizen of the State thus is applies to all persons in the State. LSA-R.S. 9:1110 is restricted to the False River area because of the unique condition there. There is no evidence that LSA-R.S. 9:1110 was enacted to secure an advantage in favor of any private individual or group of individuals, and it applies to all persons possessing characteristics of the affected class, i.e. all persons owning land adjacent to False River. The State Legislature with the Governor may act in any manner not prohibited by the Constitution. We know of no prohibitions that would have prevented the passage of LSA-R.S. 9:1110. The act is clearly a general law because it deals with the settlement of a dispute between the State and many landowners, hence every citizen by reason of State title was involved. In settling this matter in LSA-R.S. 9:1110, the Legislature was acting under its general authority to prescribe the procedure of settling disputes between the State and its citizens.
This assignment of error has no merit.

DECREE
For the foregoing reasons the judgment of the trial court is affirmed and costs in the amount of $6,733.54 for this appeal are to be paid by the State (appellant).
AFFIRMED.
NOTES
[1] An ox-bow lake is a lake that has formed in the abandoned channel of a meander (i.e., turn or winding of a stream or river) by the silting up of its ends after the stream or river has changed its course, cutting through the land within the meander at a narrow point.